Good morning, everyone. Mr. Loveson, would you come forward to the dais, please? We have an admission this morning. I'm very pleased to move the admission of James Lee Loveson to the court, to the bar of this court. He's a member of the bar in good standing of the highest court of Illinois. I have knowledge of his credentials. I'm satisfied that he and I have observed his demeanor and his style and his qualifications, and I'm delighted that he will make excellent contributions to the bar of this court through his career. And so I move your admission, Mr. Loveson, and I request Judge O'Neilly to consider the  JUDGE O'NEILLY Well, Mr. Loveson, you certainly have a good recommender, but I think we need a majority, so I'm going to ask Judge Wallach whether or not he would agree to this motion. JUDGE WALLACH I thank Mr. Loveson. You're welcome to the court, and if you could turn to the clerk, you can be sworn in. MR. LOVESON I take your right hand and swear to consult yourself, the attorney and counsel of this court, uprightly and according to law, to support the Constitution of the United States of America. I do. Congratulations. You're welcome to the bar, and I suppose we'll deal with the rest of it. JUDGE O'NEILLY Indeed, congratulations and welcome, Mr. Loveson. The first case to be argued this morning is number 2011-1547, Inree Hubbell. Ms. Monheit. INREE HUBBELL Thank you. I reserve five minutes for rebuttal. JUDGE O'NEILLY Yes. INREE HUBBELL Thank you. May it please your court, there is only one rejection that is on appeal. There is only one rejection that's preventing our application from proceeding to grant, and this rejection is not based on statute, it's not based on judicial precedent, it is only based on MPEP Section 804. The Manual for Patent Examining Procedure instructs examiners to make obviousness-type bill of patenting in cases when there is no common assignee between an application and a reference patent. JUDGE O'NEILLY Ms. Monheit, why isn't Van Ornum controlling in this case? INREE HUBBELL Well, Van Ornum deals with a case where there is identity of inventorship, so it did not decide this issue. In our case, we have four inventors that are named as inventors in the 509 application, but only two of those inventors are in common with the inventors that are named in the 601 application. JUDGE O'NEILLY But the underlying concern is the same, is it not? INREE HUBBELL There is a rationale that is discussed in the Van Ornum case, and one of the rationales for obviousness-type bill of patenting is the prevention of harassment for an infringer by multiple assignees, and that is discussed in Van Ornum. However, in that case, if you look at Van Ornum, they emphasize the control that the inventors had over the division of the ownership in its case. They talk about they chose to assign to General Motors, and then later they filed a broadening application, and they actually emphasize the nature of the disclosure in that broadening application, the second application that was on appeal, is they discuss how it's not really an invention, it's not really a contribution to the public, and this isn't something that the patent system is devised to reward with a patent. JUDGE O'NEILLY But didn't, I don't know how you pronounce this, Fallot? INREE HUBBELL Fallot is what I've been saying. JUDGE O'NEILLY Fallot. Didn't Fallot specifically say that in a circumstance where you have different owners, that the concern about harassment is in fact heightened? INREE HUBBELL I don't know if it used the word heightened, I don't recall that term, but I do recall them saying that there is a concern of the potential for harassment by multiple assignees, so I agree with that description of the Fallot report, but Fallot did not actually address this issue. The court noted that the issue of whether, obviously, federal patenting rejection could be made in this kind of case, where there's only a common inventor, but no identity of inventorship, and no common assignee was not raised or argued by either party, and that the opinion should not be read to decide or endorse the PTO's view on this issue. And in our own appeal at the BPAI, the BPAI, the board invited guidance from this court about whether or not these rejections should be made. Well, they said, absent a clear statement that would... They felt constrained by the Van Ornum and the Fallot... Yeah, let me finish my question. I'm sorry. They said that absent a clear statement from the court that their view, as expressed in the MPEPU, is wrong, then they were not going to go along with your desire to create this individual exception, correct? I agree that they said that absent direction from this court, that they felt constrained by the Van Ornum and Fallot decisions, and they didn't feel like they were a body that could make a different decision. I don't read that as the PTO saying to this court, we think this is a really close call and we want you to tell us which way to go. I read it differently, that they think they got it right. Well, my recollection when I was arguing the case at the BPAI was comments that they made such as, we are not the federal circuit, we can't decide this issue differently, that they felt constrained. And that's why I read their decision in the way that I read it. What do you want us to do? I would like you to reverse this rejection and to allow our patent to proceed to grant. I believe that these rejections are not appropriate and that they end up with an imbalance in I understand the end game, which is that you want your patent. I understand that the end game is you want your patent. How do we get there as a matter of legal theory? Do you want us to create an exception just for you? I'm actually asking you not to extend obvious mistype double patenting rejections because I don't believe that the case law requires this rejection to be made. I believe that if you found in this case that obvious mistype double patenting rejections should be made that you would actually be extending and broadening obvious mistype double patenting to new areas that the court, the judicially created law was not actually created. Do you want us to say that to the extent that the MPEP says common inventorship would give rise to this kind of a rejection that we should say that that's wrong and that common inventorship is not a circumstance? I would agree that I would like, it would be wonderful if the MPEP was corrected to state that you must have a common assignee or identity of inventorship to make these types of rejections. Identity meaning a total identity? Identity of inventorship. The way it's discussed in the cases is a total identity where it's exactly the same inventors in the application and the reference patent. So let me, I'm channeling Judge Brighton here a little bit, but let me give you a hypothetical. So say we had six inventors. What if five were the same and there was a sixth research assistant who was identified as an inventor? Would that be appropriate for an ODP rejection? I'm sorry, six inventors are named in the reference patent and five inventors are in common and named in the application at issue? Right, and under your theory then ODP would not apply, right? Right, ODP would not apply because when you look at the way Van Orden was written, they are really getting at the control that these owners, they're looking at ownership and the potential to manipulate the patent system. In our case, there's no concern that Caltech could take advantage of the patent system. Caltech is the owner of the application at issue. ETH and University of Zurich are the owners of the reference patent. It has never been the case that Caltech ever had an ownership of the 685 patent. They didn't divide the ownership like the inventors did in Van Orden. This is an equitable concept. This is a court created doctrine ODP and there has been discussion in the cases that it's because of these equitable concerns that we've already talked about. In this case where Caltech could have easily pressed its patent earlier, don't the equities go against Caltech? You're saying that the claims could have been filed earlier? Filed and pursued. I don't believe that's true. First of all, one thing I want to point out is that cases are routinely granted to two different assignees even when there's a case of dominating claims in an application and patent that's already been issued. This is a case that we discussed in the reply week. We call it unrelated entities where you have no inventors in common. You have different owners. In those cases, the patent office looks at the statutory requirements of novelty and obviousness. They look at the claims and there's never a determination, an analysis done of whether the claims that they might grant, as long as they're novel, non-obvious, meet 101, 112, all the requirements for patentability. There's never an analysis done of claims in an unrelated patent to different inventors to different owners whether or not these claims might dominate. There is the potential for harassment of an infringer by multiple assignees. This is not an issue, a policy concern that decides, that dictates the decision. In fact, the public policy of encouraging disclosure of invention is really the policy that is overriding this concern to protect infringers. What do we do with the policy, the congressional policy that seems to be reflected in the CREATE Act where they allowed for terminal disclaimers in limited circumstances, but circumstances that would not cover this? I think in the CREATE Act, if I recall correctly, what they did is they also allowed for some of those references to not be considered prior art under 102 or 103, so they made an exception from the prior art analysis. For joint research agreements. If there's a joint research agreement, right. So in making that exception, then they filled in that hole to protect the public by allowing for these kinds of cases to be reviewed under obviousness type double patenting. But there is no hole here. There is prior art. You can do a 102, 103 analysis in these cases and determine whether or not the 685 patent is prior art. In this case, it isn't as we discussed in the appeal brief. That rejection was never made. We actually asked the examiner, we said this is the rejection we think you should make and had you made it here, let's go ahead and argue it for expediency. But that's a rejection that could have been made. It has not been excluded from the realm of potential prior art. It just isn't prior art in this case. Okay, let's hear from the other side and we'll save you time for rebuttal. Thank you. Ms. H. May it please the court. Hubble doesn't dispute the substance of the board's obviousness double patenting type rejection. Instead, Hubble argues that he's in an unfair position because his species claim issued in the 685 patent before his genus claim in this appeal. But that isn't really the issue, is it? I mean, it seems to me that in all these years and throughout my practice when I was on that side of the case, you knew if you had a different inventive entity, if you didn't have common ownership, then you would have other rules. You might have an interference contest if the office thought that these were the same invention or obvious one in view of the other. But you didn't have obviousness type double patenting. And I was surprised having been out of this loop to see something or other in the NPEP which added this possible. I don't even know if that's the way you can read that provision in the NPEP. But this is very strange, it seems to me, when you have evolving inventions and you have inventors that move around, people who try and be honest in who they name as an inventor for each invention. I didn't mean to make a speech, but I found this an extraordinarily troubling kind of evolution. Contrary to the statute, these are different inventive entities and they are different owners. And to say nonetheless we're going to punish you because you filed a CIP is to me the most extraordinary office action that I've ever seen. Your Honor, first of all, I think we're not punishing them. I think Judge O'Malley asked about the equities here. They had their genus claim, they had filed that first. They had allowed claims in 2003 which are almost identical. I see that all the time. People refile. There's an evolving case. They have new information and they refile. And you say because we had allowed claims and you filed a CIP, therefore we're going to hit you with this new creative ground that nobody's ever used before? I don't think it's a new creative ground. I think this is a judge-created obviousness type double patenting that's been around for I have never seen obviousness type double patenting when there is neither commonality of ownership nor commonality of inventive entities. That was the case in the Fallot case. And in Van Ornum, there was single inventive entity. But although Hubble says... One or the other, but not both. Correct. And no common owner in Van Ornum. But what Hubble says is, well, Van Ornum is different. We believe Van Ornum is controlling. They say Van Ornum is different because they only have some common inventors, not the same inventive entity. But then they give no reason why this should make a difference. In fairness, the Van Ornum court did say that part of the problem there was that the history of the assignments meant that there was actual involvement in dividing the ownership. Yeah. I don't know that I necessarily agree with that. From reading Van Ornum, the way I understand it is those were individual inventors, two individual inventors, and then they assigned one to GM and a second application to Rock Corps. And is that really all that different from what Hubble did here? I mean, by changing employment, he assigned one to Caltech and one to University of Zurich. But it was Hubble, it was the inventor who made that decision, who assigned. And even if this court thinks that those facts are slightly different, I think whether or not the applications were commonly owned doesn't really matter in terms of the policy. The policy is to stop harassment of infringers by multiple patents. Common ownership has been in the statute and in the precedent from the beginning of this area. You're presenting a story that he decided to move to Switzerland in order to get a second patent with a different joint inventor. I mean, this is extraordinarily strange. No, I'm not suggesting that at all. But what Hubble says is, well, Caltech didn't control how the applications went. But Hubble himself controlled them by changing employment. That's all I'm saying, Your Honor. Well, let's say that these are overlapping inventions. Genus, species, we don't know whether on the merits one would render the other obvious. We see genus, species claims all the time. But you're saying that the office, if they think that these are the same inventions, has no remedy? If it turns up without any overlapping inventorship, so you can't rely on that. And different assignees. What does the office do? You declare an interference, right? Potentially, yes, Your Honor. But in this case, what I want to say is that, so Hubble had his genus claim first, and he filed his species claim later. He delayed. If he had not delayed, then he would have- He delayed the science advance. He filed a CIP. Again, you're punishing him because he did that? No, I'm saying, Your Honor, that he had claims that are almost identical to what he had here in 2003. And Hubble- It happens all the time. That's one reason why the law was changed. The life of the patent is from the initial filing date. That was a remedy. That was a dramatic change of law to remedy the possibility of keeping your applications going for nefarious reasons, such as catching the evolving science. Nobody's accused anybody of anything nefarious? No, I'm not accusing anyone of anything nefarious. But Hubble himself knew that he had these two applications pending. The same counsel prosecuted both of them. So he waits on his genus claims, his choice, but now he's saying he wants the two-way obviousness type double patenting test, which that's only applied when the patent office is responsible for the delay. Hubble admits that he is at least partially responsible. And he, in fact, just didn't pay his fees after the claims were initially allowed, right? Correct. And he let it go, abandoned, and filed again, which is Hubble's choice. But then he comes here and says to this court, well, I'm in this unfair position because my species claims issued first, and they anticipate my genus claims. Now, if Hubble hadn't delayed, and the delay was the PTO's fault, he would be entitled to this two-way test. And under that test, if he was able to prove that his species claims were patently distinct, he would have been able to get both his genus claims and his species claims. So he's asking this court to create an exception or to insulate him from his own prosecution. No, he's not. But you don't use the two-way test unless you meet the threshold requirements of double patenting. The same inventive entity, the same common ownership. Then you apply the two-way test. You don't apply it to strangers. Correct. But there is overlapping inventors here. Overlapping. The office is retreating from its rigorous position about different inventive entities. That's very interesting. No, we're not retreating from anything, Your Honor. The way we've applied it is same inventive entity or overlapping inventors. And we've been applying it that way for years. I don't know exactly how far back. How do you believe that the overlapping inventors, that mere overlapping inventors as opposed to complete identity of inventorship, serves the policy purposes behind the OGP rejection? There's no distinction, Your Honor, because if there's same inventive entity, there are same overlapping inventors. So I don't see any distinction. And Hubble hasn't pointed to anything that tells us that the court should make a different rule for that. And in Fallot, the court, although it had that footnote and said it's an open question because nobody brought it up, in Fallot, the court affirmed the office's double patenting rejection. As to the terminal disclaimers, as Your Honor said, you know, the CREATE Act was to cover specific situations which they don't meet. And again, I don't think, in Van Ornum, this court upheld PTO's terminal disclaimer, you know, regulations and said they were valid. And in Van Ornum, they were not able to overcome their double patenting rejection over one of the patents because they didn't have common ownership. And this court found that that was correct. Okay. Any more questions? Any more questions? Isn't the underlying concern the same, and that is the potential for harassment? It is, Your Honor. It seems to me it does, whatever the shift in posture is on the commonality, the potential remains the same. Correct, Your Honor. And again, you know, whether or not the applications were ever, you know, owned at one point, I don't think really matters because what people, you know, who are practicing and are afraid of being called infringers worry about is the issue of patents. Well, but it's clear that there is this remedy of terminal disclaimer. As I understood it, the whole evolution of double patenting with the CCPA was because the statute written in 1790 says an inventor is entitled to a patent. And all of a sudden, we got the genus, species, and so on. So that you still have two patents, it's just that you don't have the possible extension of the life of the second one that was filed or that was allowed because of the patent life running from the date of grant. So you have the same potential for harassment when you have a terminal disclaimer, which under even the more restricted conditions you're talking about, you're entitled to. So to say that it's the potential for harassment is quite tempting, except that you aren't eliminating that at all. But the terminal disclaimer eliminates that, Your Honor, because the terminal disclaimer says the patents are only enforceable as long as they're commonly owned. Yes. So after 17 years, you say, all right, we can't harass you anymore. But meanwhile, I'll give you 17 years of headache. I guess I don't understand the question, Your Honor. Well, I find this very strange interpretation of what once was an extremely clear and applicable statute. Applicants knew what to expect when they had a genus, species. They knew what the future held. They tried to accommodate it within the law. And now you tell us it's an equitable doctrine, and you have to go to the board and throw yourself on their mercy and then come to this court and see what our view of the equities might be in order to resolve what once was a totally clear, clear enough as far as the law is concerned provision. And I find this very strange, and I don't see how this helps either the office or the public. Well, Your Honor, we think we have been clearly applying it. And we think, particularly in this case, the equities are not in Hubble's favor. And Hubble is asking this court to change its precedent, Ben Warnham, based on distinctions that we think do not matter. And we don't think the equities fall in Hubble's favor. OK. Any more questions for Ms. Lynch? Any more questions? Thank you. Thank you, Ms. Lynch. Ms. Monaghan? Thank you. I just wanted to go back to the rationale of harassment that we've been discussing so much today and point out, again, that this rationale is a rationale associated with why obvious incite double patenting was created. However, it's never, on its own, been enough to prevent the grant of patents. And that is why we pointed out the unrelated entities scenario. In the unrelated entities scenario, where you have different owners, the patent office routinely grants dominating claims in an application as long as it meets the other requirements. It does not look to the patents or pending applications of other owners of other inventors. And it doesn't do that analysis. The analysis it could do is it could check for if an interference applies. And in that case, what's the standard that would be applied to see if it's the same invention? Two-way analysis. That's the standard the patent office would apply to determine if an interference should be made, if there is the same invention. But you can see you couldn't satisfy the two-way analysis. No. I'm saying in an interference context for different inventive entities, that is, if an interference was to be declared between different inventive entities, which means that you don't have the same owner, there's no common owner. So this concern that the patent office has that it has no ability to do anything if there are different owners, of course, it has the ability to do something if it believes that there's the same invention. It has a way of protecting the public from those types of situations, and it does that in the interference context. Let me take you back to FLO, the part that you said you don't recall in FLO. It is right before the conclusion. It says the harassment justification for obvious mistype double patenting is particularly pertinent here because the FLO application and the FOBOS patent are not commonly owned. Isn't that, in fact, what the court said in FLO? I appreciate you bringing that up, but the court also pointed out that the divided ownership was controlled by FLO, and that's, I believe, in a footnote. If you want me to, I can check it, but you probably have it in front of you. But the FLO court pointed out that in this case, while it wasn't an issue before the divided ownership, these had once been commonly owned, and the division of ownership was due to the applicant itself, due to the owner itself. That is not the case here. We are distinguished on the facts here. We never had the same owner. I want to just point out two other things, that if obvious mistype double patenting rejections are extended to this case, an applicant who discloses and claims a generic invention can later be prevented from having a patent with the generic claims issued by the species claims, now over species claims, of a later inventive entity. Such applicants are precluded from obtaining a patent because there is no ability to file a terminal disclaimer. They're not able to obtain a patent on the full scope of their invention because there's no remedy such as a terminal disclaimer to permit them to proceed to allow. But they had a patent. I'm sorry? They had a patent. They had claims that were allowed, and they walked away from them. The claims required recombinantly producing the fusion protein. I appreciate you pointing that out. When the claims were granted, the Caltech looked at those claims and said, you know what, we disclose that it doesn't have to be limited to recombinantly producing it. Let's refile it. We'll get it allowed quickly. It was a shock that this is where we are today, that nine years later we are arguing this case before the Federal Circuit to try to get a patent that we believe should have been proceeded to grant very quickly when we filed it in 2003, exactly because very similar claims were allowed, and they realized we shouldn't be limited to recombinant that had been there from the beginning. It was, in retrospect, an error. It wasn't the full scope of what they thought they deserved, and we disclosed that it doesn't have to be limited like that. There was no prior art rejection on that. It was something that had just been there from the beginning. It was an oversight. We refiled the case as quickly as we noticed the oversight. We then languished at the patent office for some period of time. We had a priority issue that was dismissed, and then the civil patenting issue arose. It was not anything but to correct an oversight in the scope of the claims. It was a shock that this is what happened. But an oversight that is attributable to Caltech, not attributable to anything that the PTO did. Right, but in 2003, we immediately refiled the case as a continuation and should have proceeded to grant. There's no prior art rejection. There's no problem. There shouldn't have been a problem. This results in an imbalance in the system because you're saying to people, consider if your inventors are going to move before you file an application. Before you file an application, just be careful your inventor's not about to move somewhere else because he'll probably continue his research. Or, you know what, let's make restrictive covenants to stop people from continuing competing research when they move. How about when you file your application, make sure that you claim what it is you think you invented? Had he remained at Caltech, we'd be able to get this patent. We'd file a terminal disclaimer. We have no problem with filing a terminal disclaimer if we could. We can't. We're asking if you believe obviousness-type bill of patenting shouldn't exist, then fine it shouldn't exist. If you believe it should exist, give us a remedy. Give us something. Could you have resolved it through a contract in some fashion? There is no easy way to resolve it through contract. These are elaborate cases that have multiple terminal disclaimers that have been filed which would affect multiple cases and multiple ownerships. So at this point, does the bill of patent... When he came into Caltech, could you have resolved it through a contract? To ETH and University of Zurich. We would have had to recognize, I mean, there could have been a joint... Well, he left Caltech to go to... To ETH, yes. So when he came into Caltech, if Caltech had bound him in some fashion, that would have resolved it, wouldn't it? Right. So theoretically, if we wanted to restrict people's ability to do research and stop them, theoretically we could ask research institutions to enter into restrictive covenants which may or may not be upheld and prevent their employees from continuing to do research in important areas. This is wound healing. Why does it have to be that? I'm sorry. Why isn't it simply a transfer of rights and interests? He can still do the research. You're saying, but ETH shouldn't support that research because it wouldn't own it. I'm sorry, I'm trying to follow your hypo. What I'm saying is that it seems to me that lawyers could sit down and discern these problems in advance and write around them. You may be correct. I'm not aware of the best way to do that. And receiving guidance from this court would be very helpful in knowing what we could have done to have dealt with this kind of situation. But I think it's very common for people to move, for them to continue the research, and the institution that they're continuing the research believes that they will be the owner. They make them sign agreements saying, you will assign all of your rights for your inventions. And that's the common practice today. So the way the system is set up today, I think it would be difficult, but I'm open to suggestions on things that could be done better. Okay, any more questions? Okay, thank you both. Casey's taken another submission.